Erin E. Hogan-Freemole (OSB # 212850)
971-417-6851│ehoganfreemole@wildearthguardians.org
Ryan Talbott (OSB # 131383)
503-329-9162│rtalbott@wildearthguardians.org
WILDEARTH GUARDIANS
213 SW Ash Street, Suite 202
Portland, OR 97204

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **WILDEARTH GUARDIANS**, a New Mexico nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>**AMANDA HOFFMAN**, in her official capacity as Field Manager for the Cascades Field Office; and the **BUREAU OF LAND MANAGEMENT**, a federal agency,<br><br>Defendants. | Case No. 3:25-cv-745<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(National Environmental Policy Act; Federal Land Policy and Management Act; Administrative Procedure Act) |

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management, or all named defendants |
| CEQ | Council on Environmental Quality |
| CX | Categorical exclusion |
| dbh | Diameter at breast height: The diameter of the stem of a tree measured at 4.5 feet above the ground level on the uphill side of the stem |
| District | BLM Northwest Oregon District |
| DM | BLM Departmental Manual |
| DOI | U.S. Department of the Interior |
| DR | Hotcase Categorical Exclusion Review and Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| Guardians | Plaintiff WildEarth Guardians |
| Hood | Sharon Hood et al., USDA Forest Service, Report No. R6-FHP-RO-2020-02, *Post-Fire Assessment of Tree Status and Marking Guidelines for Conifers in Oregon and Washington* (June 2021) |
| Invasive species | A non-native species whose introduction does, or is likely to, cause economic or environmental harm or harm to human health. |
| NEPA | National Environmental Policy Act |
| Project | Hotcase Lane Salvage Project |
| Riparian reserve | A riparian area managed for the conservation and recovery of protected species, maintenance of water quality, and restoration of riparian habitat. Salvage logging is typically prohibited |
| RMP | BLM, NORTHWESTERN AND COASTAL OREGON RECORD OF DECISION AND RESOURCE MANAGEMENT PLAN (2016) |
| Salvage | Post-fire logging intended to remove dead or dying trees to "salvage" their economic value. May also refer to such logging after a wind event that severely damages trees. |

## INTRODUCTION

1.      The Hotcase Lane Salvage Project ("Hotcase Project" or "the Project") area is within the 2020 Riverside Fire perimeter but includes forest stands that burned at a low to moderate intensity, leaving most trees alive. It encompasses a largely intact section of riparian reserve upstream of endangered fish habitat, and contains foraging habitat for the threatened northern spotted owl. The Project area's large trees and cool, shaded riparian zone, surrounded by more intensely burned areas and recent industrial logging, provide an important refuge within the post-fire landscape.

2.      The Hotcase Project authorizes the removal of many large, living trees. Although nearly five years have passed since the Riverside Fire, the BLM insists that these remaining green trees are in imminent danger of dying and pose a serious hazard to public safety and access—a conclusion based on the blatant misapplication of agency guidelines.

3.      In fact, the Project's aggressive logging would compound the impacts of the fire and leave the few remaining trees at increased danger of windthrow, actually *worsening* the conditions it purports to address.

4.      The Project is only one notable example of the BLM's recent salvage spree, much of it conducted without proper environmental review. The agency has relied on a "categorical exclusion" for small-scale harvest of dead and dying trees, stitching together numerous small projects into a landscape-scale logging campaign.

5.      The BLM failed to properly consider and disclose the Project's impacts, both individual and cumulative, circumventing environmental review through unlawful reliance on multiple categorical exclusions, none of which are applicable here.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    1

6. Moreover, because the Project authorizes commercial salvage logging in a protected riparian reserve, it conflicts the BLM's own resource management plan.

7. Plaintiff WildEarth Guardians ("Guardians") challenges the Categorical Exclusion Review and Decision Record authorizing the Hotcase Project for violations of the National Environmental Policy Act ("NEPA"), Federal Land Policy and Management Act ("FLPMA"), and Administrative Procedure Act ("APA").

8. Guardians seeks a declaration that the BLM violated NEPA, FLPMA, and their implementing regulations by (a) failing to prepare an EA or EIS; (b) failing to take a "hard look" at and publicly disclose the Project's environmental impacts; and (c) failing to comply with the governing resource management plan. Guardians further seeks to enjoin the BLM from implementing the Project unless and until the violations of law set forth herein have been corrected. The requested relief is necessary to preserve the status quo, to prevent unlawful agency action, and to forestall irreparable injury to Guardians and the environment.

9. Because logging has already begun on the Project, Guardians will seek to expedite these proceedings or, in the alternative, request narrowly tailored injunctive relief during the pendency of this litigation.

## PARTIES

10. Plaintiff WILDEARTH GUARDIANS is a nonprofit environmental advocacy organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Headquartered in New Mexico, WildEarth Guardians has over 190,000 members and supporters across the western states and maintains an office in Portland, Oregon, roughly 35 miles from the Project area.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    2

11.    Guardians' members, staff, and supporters regularly hike, camp, hunt, forage, view wildlife, practice nature photography, and engage in other vocational, educational, scientific, and recreational activities on BLM land, including the Hotcase Project area and adjacent lands. Since 2020, they have enjoyed the opportunity to observe the Project area's natural post-fire regeneration, particularly as much of the surrounding area has been heavily logged in recent years.

12.    Guardians' members, staff, and supporters intend to continue visiting the Hotcase Project area and surrounding federal lands for the foreseeable future. Their use and enjoyment of the area will be significantly diminished if the Project is implemented as planned. Guardians seeks to ensure that its members, staff, and supporters can continue to derive recreational, inspirational, educational, and aesthetic benefits from their activities in and around the Project area.

13.    Guardians also has an organizational interest in the lawful and scientifically sound management of the Project area. Guardians frequently communicates with BLM personnel regarding public land management, seeking to protect its members, staff, and supporters' interests by ensuring that the agency fully complies with federal environmental laws.

14.    Unless this Court grants the requested relief, Guardians and its members, supporters, and staff will be irreparably harmed by the Hotcase Project's implementation.

15.    Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency of the United States within the Department of the Interior. It is charged with managing and conserving 245 million acres of public lands in accordance with applicable federal laws and regulations. The BLM developed and authorized the Hotcase Project challenged in this action.

16.    Defendant AMANDA HOFFMAN is sued in her official capacity as the Field Office Manager for the Cascades Field Office on the BLM's Northwest Oregon District. Ms. Hoffman authorized the Hotcase Project on behalf of the BLM.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    3

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question) and 1346 (United States as defendant).

18.     This action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701–706; FLPMA, 43 U.S.C. §§ 1701–1787; and NEPA, 42 U.S.C. §§ 4321–4370j. An actual, justiciable controversy exists between Guardians and the BLM, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2102 (declaratory and injunctive relief).

19.     Guardians exhausted its available administrative remedies by submitting timely scoping comments on the Project. The challenged actions or failures to act are subject to this Court's review under 5 U.S.C §§ 702–706.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, the public lands and resources at issue are located in this district, and all Parties maintain offices in this district.

21.     The Hotcase Project is located in Clackamas County, Oregon. Pursuant to Local Rule 3-2, this case is properly filed in the Court's Portland Division in Portland, Oregon.

## LEGAL FRAMEWORK

### Federal Land Policy and Management Act

22.     Congress enacted FLPMA to ensure that our public lands are "managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource and archeological values." 43 U.S.C. § 1701(A)(8). It directs the BLM to develop a land use planning process for present and future uses of public lands. *Id*. § 1701(a)(2).

23.     To achieve these goals, FLPMA requires the BLM to develop resource management plans ("RMPs") that govern the use of BLM-administered land. *Id.* § 1712. An RMP defines the values for which the BLM must manage the land to which it applies, and contains substantive standards by which it must do so. Once the plan has been adopted, the BLM must manage its lands in compliance with, and ensure that any site-specific projects conform to, the applicable RMP. *Id.* § 1732; 43 C.F.R. § 1610.5-3(a).

24.     An RMP does not analyze or authorize any specific projects. Rather, the RMP is a preliminary step in the overall process of managing public lands, intended to guide and control future management actions. All subsequent implementing actions must independently comply with all applicable laws, including FLPMA, the Endangered Species Act, and NEPA.

**National Environmental Policy Act**

25.     NEPA "declare[s] a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

26.     To achieve these aims, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

27.     Federal agencies must prepare a "detailed statement" for any "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This "Environmental Impact Statement" or "EIS," must describe the proposed action's adverse environmental impacts and alternatives to the proposed action. *Id.* If the proposed action "does not

have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," the agency may instead prepare an "Environmental Assessment," or "EA." 42 U.S.C. § 4336(b)(2). An EA is a concise public document which provides sufficient evidence and analysis for determining whether the agency must prepare an EIS or a finding of no significant impact. *Id.*

28.     Like an EIS, the EA must analyze and disclose any direct, indirect, or cumulative environmental effects of the proposed action. Direct impacts are caused by the action and occur at the same time and place. 40 C.F.R. § 1508.8(a) (2019).[1] Indirect impacts are caused by the action but occur later in time or are farther removed in distance. *Id.* § 1508.8(b). Cumulative impacts are the impacts of the proposed action, as well as impacts from other past, present, and reasonably foreseeable future actions, both federal and non-federal. *Id.* § 1508.7; *see also* 43 C.F.R. § 46.115. "Cumulative impacts can result from individually minor but collectively significant actions." 40 C.F.R. § 1508.7; *see also* 43 C.F.R. § 46.215(f) (requiring BLM to consider actions with "individually insignificant but cumulatively significant environmental effects").

29.     For certain specific categories of actions that an agency has found to have "no significant individual or cumulative effect on the quality of the human environment," the agency may usually forego preparation of an EA or EIS. 43 C.F.R. § 46.205. Such "categorical exclusions," or "CXs," are intended to cover routine agency activities of limited scope.

---

[1] The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA. 42 U.S.C. § 4342 (establishing CEQ); 40 C.F.R. §§ 1500–1508 (2024) (CEQ's NEPA regulations). The Project was approved pursuant to the 2024 version of the CEQ regulations, which were subsequently withdrawn entirely, effective April 11, 2025. *See* 90 Fed. Reg. 10,610 (Feb. 25, 2025). However, the BLM rules and regulations at issue here incorporate definitions from a previous version of the CEQ regulations. *See, e.g.*, 43 C.F.R. §§ 46.30, 46.205. This complaint will therefore cite to 40 C.F.R. §§ 1500–1508 (2019) unless otherwise noted, as these regulations are necessary to give the relevant rules meaning.

30.     The agency may not "stack" multiple CXs to avoid preparing an EA or EIS for a project that is not entirely covered by any one CX—if any proposed activities do not fit within the agency's single chosen CX, the project cannot be categorically excluded from standard NEPA review.

31.     The Department of the Interior has promulgated a CX for "[r]outine and continuing government business, including such things as supervision, administration, operations, maintenance, renovations, and replacement activities having limited context and intensity (e.g., limited size and magnitude or short-term effects)." *Id.* § 46.210(f).

32.     The BLM has also adopted its own CXs, which are set forth in its Departmental Manual ("DM") but have not been codified. As relevant here, these include a CX for "[s]alvaging dead or dying trees not to exceed 250 acres, requiring no more than 0.5 mile of temporary road construction." 516 DM 11.9(C)(8). Such "salvage" projects "[m]ay include incidental removal of live or dead trees for landings, skid trails, and road clearing." *Id.* A "dying tree is defined as a standing tree that has been severely damaged by forces such as fire, wind, ice, insects, or disease, and that in the judgment of an experienced forest professional or someone technically trained for the work, is likely to die within a few years." *Id.*

33.     Even if a proposed action would usually fall under a CX, an agency must determine whether "extraordinary circumstances" exist such that the "normally excluded action may have a significant environmental effect and require additional analysis and action." 43 C.F.R. § 46.205(c).

34.     The BLM has identified 12 specific extraordinary circumstances that it must consider before authorizing a project under a CX. These include: "highly controversial environmental effects or … unresolved conflicts concerning alternative uses of available resources"; "a direct relationship to other actions with individually insignificant but cumulatively

significant environmental effects"; significant impacts to threatened or endangered species or their critical habitats; and the potential to contribute to or promote "the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area[.]" *Id.* § 46.215.

35.    If a proposed action does not meet the specific criteria for a CX, or if any extraordinary circumstances exist, the agency must fully analyze its effects in an EA or EIS. *See id.* § 46.205. Additionally, all actions authorized under a CX "must be, at a minimum, consistent with DOI and BLM regulations, manuals, handbooks, policies, and applicable land use plans regarding design features, best management practices, terms and conditions, conditions of approval, and stipulations." 516 DM 11.9.

36.    Regardless of the level of NEPA review, an agency must ensure the professional and scientific integrity of its analysis; it cannot gloss over responsible opposing views or evidence contrary to its conclusions. 43 C.F.R. §§ 1502.9, 1502.24. The agency must draw a rational connection between the facts and its ultimate conclusions.

**Administrative Procedure Act**

37.    The APA confers a right of judicial review on any person adversely affected by final agency action. 5 U.S.C. §§ 702, 704. Upon review, a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. *Id.* § 706(2). The presumptive remedy for unlawful agency action is vacatur and remand.

## FACTUAL BACKGROUND

**The 2016 RMP**

38.    The 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan ("RMP") provides overall direction for the management of all resources on approximately 1.3 million acres of BLM-administered lands, including the Cascades Field Office and the Project area.

39.    The BLM adopted the RMP after preparing a Final Environmental Impact Statement which broadly analyzed and described a total of 2.5 million acres across western Oregon. Vegetation, hydrology, geology, wildlife populations, fire history, proximity to human development, and past resource use vary widely across this enormous planning area.

40.    The management objectives of the RMP include, in relevant part, to provide a sustained yield of timber, enhance the health and stability of forest stands, prevent the introduction of invasive species, contribute to the conservation and recovery of threatened and endangered species, provide clean water in watersheds, and restore fire-adapted ecosystems.

41.    To achieve these objectives, the RMP imposes substantive standards and guidelines for managing a broad range of resource values, including preventing the introduction and spread of invasive species infestations; restoring ecosystem resilience to wildfire and decreasing the risk of uncharacteristic, high-severity fires; limiting detrimental soil disturbance; and managing habitat conditions for northern spotted owl survival and habitat connectivity.

42.    The RMP also divides BLM land into "land use allocations" which dictate the management objectives and the activities which may or may not be undertaken in a particular area, including a system of riparian reserves.

43.    Management objectives for riparian reserves are to:

- Contribute to the conservation and recovery of ESA-listed [and Bureau Special Status] fish species and their habitats …
- Maintain and restore natural channel dynamics, processes, and the proper functioning condition of riparian areas, stream channels, and wetlands by providing forest shade, sediment filtering, wood recruitment, stream bank and channel stability, water storage and release, vegetation diversity, nutrient cycling, and cool and moist microclimates.
- Maintain water quality and streamflows within the range of natural variability, to protect aquatic biodiversity, provide quality water for contact recreation and drinking water sources.
- Meet Oregon Department of Environmental Quality (ODEQ) water quality criteria.
- Maintain high quality water and contribute to the restoration of degraded water quality for 303(d)-listed streams.
- Maintain high quality waters within ODEQ-designated Source Water Protection watersheds.

44.     To achieve these objectives, the RMP specifically prohibits timber salvage in riparian reserves, "except when necessary to protect public safety, or to keep roads and other infrastructure clear of debris."

45.     When removing "hazard trees and blowdown from roads" in riparian reserves, the BLM is instructed to "[r]etain such logs as down woody material within adjacent stands or move for placement in streams for fish habitat restoration, unless removal of logs, including through commercial harvest, is necessary to maintain access to roads and facilities." If trees must be cut for "road construction, maintenance, and improvement," the BLM generally must retain the cut trees as down woody material or placed in streams for fish habitat restoration.

46.     The BLM is required to demonstrate how any project developed under the RMP will follow relevant management directions, including demonstrating compliance with management direction for the land use allocation in question.

**The Hotcase Project**

47.     The Hotcase Project authorizes intensive "salvage" logging on 189 acres, including 20 acres of riparian reserves, that burned at low severity in the 2020 Riverside Fire.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    10

48.    Most of the standing trees in the Project area—particularly the larger Douglas firs that dominate parts of the Project—are green and living nearly five years after the fire.



*Aerial view of the Hotcase Project area, Unit 5. February 19, 2025 by Arran Robertson.*

49.    Much of the surrounding area, in contrast, has been heavily logged. The Project area encompasses some of the few intact forest stands in the immediate vicinity, which is a patchwork of federal and private lands.



*Border of the Hotcase Project area, Unit 5. February 19, 2025 by Arran Robertson.*



*Border of the Hotcase Project area, Unit 5. February 19, 2025 by Arran Robertson.*

50. On August 13, 2024, the BLM issued a scoping notice for the Project, which it stated was needed to "reduce hazards along existing haul routes in the Project area."

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    12

51.     The scoping notice briefly described the proposed actions as including removal of "dead and dying timber within the identified unit areas and along associated roads," but did not specify how "dead and dying timber" would be identified or what the logging prescription might be. The BLM stated that it would follow RMP management direction, but did not identify the legal authority under which it intended to authorize the Project.

52.     Guardians submitted scoping comments on September 13, 2024. It flagged several concerns regarding the proposed salvage logging, including potential impacts to riparian reserves and riparian habitat, fire and fuels, snag habitat, soils, invasive species, and spotted owl habitat.

53.     Guardians also noted that the BLM's salvage CX did not permit logging live trees, and that much of the Project area had burned at low to moderate severity.

54.     Guardians asked the BLM to reconsider and fully analyze its broader salvage logging program, as the Project was one of many such small sales, heightening the potential for significant cumulative impacts. Indeed, much of the forest surrounding the Project area has already been heavily commercially logged since 2020.

55.     The BLM did not respond to Guardians' comments.

56.     Instead, on November 20, 2024, the agency issued its "Categorical Exclusion Review" and "Decision Record" ("DR") for the Hotcase Project.

57.     The Project's stated purpose is to "recover the economic value of dead and dying trees." Although the DR no longer identified a need to "reduce hazards along existing haul routes in the Project area," it stated that "the roadside hazard tree removal aims to maintain safe access to BLM lands, specifically in [riparian reserves]. Primary activities under the proposed action include removing and selling dead and dying timber within the 5 units in the project area to recover economic values and to minimize commercial loss or deterioration of damaged trees."

58.    The DR asserts that "[n]o new roads are proposed as a part of this project," but elsewhere states that the "existing road network requires minimal temporary road construction" to "address[] public access needs for BLM administered roads[.]" This suggests that only *temporary* roads will be constructed—although the DR fails to identify the location of any such construction—apparently to facilitate "hazard tree" removal along existing roads.

59.    The Hotcase Project also authorizes "routine maintenance … specifically for culvert replacement[.]" It is unclear whether the culvert replacement is currently needed, or if it will be necessitated by logging operations and the use of heavy equipment in and around riparian areas.

60.    The BLM stated that it was authorizing the Project under three different CXs: one for "[r]outine and continuing government business, including … maintenance, renovations, and replacement activities having limited context and intensity," 43 C.F.R. § 46.210(f); one for "[s]alvaging dead or dying trees not to exceed 250 acres," 516 DM 11.9(C)(8); and one for "[i]nstallation of … culverts … on/or adjacent to roads and trails[.]" 516 DM 11.9(G)(2).

61.    The DR does not identify which CX is being used to authorize which activities, although it appears that logging will occur pursuant to all three: The DR states that the BLM "has experience with culvert replacement, including salvaging dead and dying timber for economic recovery."

62.    The DR recites the salvage CX definition of "dying tree" as "a standing tree that has been severely damaged by forces such as fire, wind, ice, insects, or disease, and is likely to die within a few years." It further states that "all burned trees with a greater than 50% probability of survival, as observed through crown and bole scorch" would be retained, and cited the "Post-Fire

Assessment of Tree Status and Marking Guidelines for Conifers in Oregon And Washington" ("Hood") as the metric the BLM would use to identify such trees.[2]

63.    Additionally, the BLM stated that it had identified and reserved "the largest trees (12 to 30 inches dbh) as those most likely to remain standing longer" and "trees greater than 40 inches dbh and born before 1850." It did not explain why trees between 30 and 40 inches dbh, or greater than 40 inches dbh but born since 1850, would be cut.

64.    The DR includes an "Extraordinary Circumstances Checklist," which briefly set forth the BLM's rationale for determining that none of the 12 enumerated extraordinary circumstances compelled preparation of an EA or EIS.

65.    With minimal analysis, the BLM concluded that the Project would "not have significant impacts on" any extraordinary circumstances, including "highly controversial environmental effects or … unresolved conflicts concerning alternative uses of available resources"; "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects"; significant impacts to threatened or endangered species or their critical habitats; and the potential to contribute to or promote "the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area[.]"

66.    The BLM concluded that "no further environmental analysis is required" and authorized the Project for swift implementation under two timber sales in 2025.

67.    There was no further opportunity for public comment, nor an objection period.

---

[2] Sharon Hood et al., USDA Forest Service, Report No. R6-FHP-RO-2020-02, *Post-Fire Assessment of Tree Status and Marking Guidelines for Conifers in Oregon and Washington* (June 2021), https://www.fs.usda.gov/rm/pubs_journals/2021/rmrs_2021_hood_s003.pdf.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    15

68.    Guardians appealed the Project decision to the Interior Board of Land Appeals, but has yet to receive a determination.[3] Guardians again highlighted the unlawful use of a salvage CX to authorize green trees that are neither dead nor dying, noted the many extraordinary circumstances implicated by the Project, and explained that the proposed salvage logging in a riparian reserve conflicted with the governing RMP.

69.    The BLM proceeded with the sale and implementation of the Project despite Guardians' appeal.[4]

70.    As of the date of this complaint, many of the timber units have been marked for logging and, indeed, logging has already begun on the Project.

71.    Guardians now seeks judicial review of the Project to prevent further harms from the BLM's failure to adhere to NEPA and FLPMA.

### FIRST CLAIM FOR RELIEF
### (Violations of NEPA and APA)

### Count One: Failure to Prepare an EA or EIS

72.    Guardians realleges and incorporates by reference all preceding paragraphs.

73.    The BLM improperly stacked multiple CXs, authorized green-tree logging under a salvage harvest CX, and failed to conduct an adequate extraordinary circumstances review. The BLM's authorization of the Hotcase Project under a CX was therefore unlawful. By failing to

---

[3] Because an appeal to the Board does not stay implementation of a project, these appeals do not constitute an effective administrative remedy that must be exhausted prior to filing suit.

[4] The sale notice for the Hotcase Project stated that it had "been administratively appealed to the Interior Board of Land Appeals (IBLA). The Bureau of Land Management (BLM) will proceed with normal bidding on the tract. Although it is not known at this time what decisions IBLA will issue, this notice is given to advise all bidders that significant delays may occur before award of the sale or before any operations may be undertaken. Additionally, an adverse ruling may require the BLM to cancel the sale or modify the sale terms."

analyze, disclose, and consider public comment on the Project's potential impacts in an EA or EIS, the BLM violated NEPA and its implementing regulations.

**Stacking CXs**

74.    The BLM unlawfully "stacked" multiple CXs to exempt an action not fully covered by any one CX from full NEPA review in an EA or EIS. NEPA does not allow the BLM to combine a CX for routine maintenance activities, a CX for culvert installation, and a CX for salvage harvest to exempt intensive logging of living trees—including in riparian reserves, where salvage logging is specifically prohibited—from proper scrutiny in an EA or EIS.

**Logging Green Trees and Non-Hazardous Trees**

75.    Even if the BLM could properly rely on both a maintenance CX and a salvage harvest CX to authorize the Project, neither would apply here.

76.    The salvage CX is limited to logging "dead or dying trees ... that in the judgment of an experienced forest professional or someone technically trained for the work, is likely to die within a few years." 516 DM 11.9(C)(8). The Project authorizes logging living trees with no indication that they are "likely to die within a few years." This does not fit within the BLM's chosen CX.

77.    Per the DR, the BLM will rely on Hood to determine which trees have "a greater than 50% probability of survival, as observed through crown and bole scorch." DR at 1. But Hood explicitly states that its metric for probability of survival is "not applicable" after the second post-fire winter. Here, the BLM intends to apply it nearly five years after the fire—long after the guidelines cease to be informative or applicable. The BLM makes no attempt to explain this strategic departure from Hood.

78.     The BLM also fails to explain its choice to retain only trees with "a greater than 50% probability of survival." This, too, is an unacknowledged departure from Hood, which recommends that "land managers carefully document the rationale used to make probability of mortality (Pm) level selections[.]"

79.     The BLM's deliberate choice to log trees that are as likely to survive as to die is not dictated by Hood, which notes that this aggressive approach is not appropriate for many situations.

80.     More importantly, the BLM's approach is not congruent with the salvage CX, which allows the BLM to target only trees that are "likely" to die—not those with a 50% chance of living.

81.     The BLM—with no attempt at an explanation—relies on plainly inapplicable guidelines to aggressively target trees unlikely to die within a few years. The resulting Project cannot be forced into conformity with the salvage CX.

82.     Nor does the "routine" road "maintenance" CX apply to commercial logging.

83.     The maintenance CX specifically states that it applies only to "routine" activities with "limited context and intensity"—not logging hazard trees or reopening logging roads. Moreover, there is no support whatsoever for the BLM's assertion that the trees it plans to log under this CX are hazardous or in any danger of impacting roads in the next few years.

84.     The DR never defines "hazard tree," apparently assuming that any fire-damaged tree—as defined by Hood—is also hazardous. But Hood explicitly states that this is a misuse of the guidelines: "This document should *not* be used as hazard or danger tree guidelines. It does not account for the probability of tree failure after fire, only the likelihood of death." (Emphasis in original). Hood only assesses the probability that a tree will die (and only when applied within a few years of the fire).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    18

85.    The DR also neglects to explain how close a tree must be to the road to constitute a "hazard" if it actually fell. Presumably, since no maximum distance is given, every tree in the Project area is potentially hazardous and can be logged.

86.    This is not routine road maintenance. It cannot be authorized pursuant to a CX.

87.    In sum, neither of the BLM's CXs apply to the Hotcase Project's commercial logging.

**Extraordinary Circumstances**

88.    Finally, even if the Hotcase Project *did* fit within any CX, the BLM failed to properly consider and rationally support its conclusion that there were no extraordinary circumstances compelling the preparation of an EA or EIS.

89.    The DR states that the Project conforms to the RMP, that "actions implemented in conformance with the [RMP], which the Proposed Action would be, would not violate [applicable laws]," and that the Project therefore "would not violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment."

90.    Leaving aside this questionable logic—the RMP itself explains that all implementing projects must independently conform to all relevant laws and requirements, not that all implementing projects should be assumed to do so—the Hotcase Project does not conform to the RMP. *See infra* ¶¶ 110–22.

91.    The Hotcase DR asserts that the Project "would not have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources." Yet the very next paragraph concedes that salvage logging "has had considerable debate about controversial environmental effects to future fire and fuels concerns," and that "further research is needed to help understand the tradeoffs." In other words, the Project would

indeed have "highly controversial environmental effects" *and* "involve unresolved conflicts" concerning environmental values.

92.    Similarly, the BLM's conclusion that the Project "would not have highly uncertain and potentially significant environmental effects" is undercut by its previous statements regarding salvage logging, fire and fuels, and spotted owls, as well as its further admission that the impact of salvage logging on soils are uncertain.

93.    Despite noting that the Project area contains a known spotted owl site and owl foraging habitat, the DR summarily concludes that the Project would have no significant impact on spotted owls because "[t]here are no active Northern Spotted Owl sites within disruption distance of the project area, nor is there any Critical Habitat in the vicinity." This is insufficient, particularly given that much of the surrounding area has already been heavily logged and there is little remaining owl habitat.

94.    Moreover, although the Project authorizes logging in a riparian reserve upstream of ESA-listed fish species, the DR asserts that "[t]here is no mechanism for an effect from salvage harvest or culvert replacement on fish or Critical Habitat downstream." This is simply incorrect— the "mechanism for an effect from salvage harvest" is increased water temperature and turbidity, both of which impact aquatic species and habitat downstream. The BLM was obligated to acknowledge this "mechanism for an effect" and support its implied conclusion that those effects would be insignificant.

95.    The DR next states that the Project would not "contribute to" or "promote" the "introduction, continued existence, or spread of noxious weeds or nonnative invasive species." Once again, this conclusion is wholly unsupported by the BLM's rationale. The following paragraph acknowledges that the Project would increase the likelihood of introducing and

spreading noxious weeds known to be present in the area—just as similar previous logging projects did. And the DR acknowledges that the Project would have cumulative as well as individual effects on invasive species spread.

96.     The BLM optimistically asserts that the Project "would be implemented to minimize" its effects on invasive species, and that post-harvest monitoring would "reduce the potential for establishment of noxious weeds associated with this project." But attempting to minimize or later address an adverse effect is quite different from not causing it in the first place. The BLM was obligated to consider and disclose the Project's potential impacts on invasive species infestations, which constitute an extraordinary circumstance.

97.     Remarkably, the BLM also insists that the Project "would not have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." But this conclusion again runs entirely counter to the truncated analysis in the DR, which notes that "other public and private actions that are directly related to the Riverside Fire" have occurred, are occurring, or are "reasonably foreseeable" across the 131,800 acres affected by the fire. On information and belief, these other actions—which the DR does not specifically identify, much less analyze for cumulative impact—include tens of thousands of acres of intense salvage logging around the Project area.

98.     These are precisely the sort of "directly related" actions that produce "cumulatively significant environmental effects," regardless of how "individually insignificant" each logging project is. This factor alone is enough to make the application of a CX improper—and here, many of the potential cumulative impacts also constitute extraordinary circumstances in their own right.

99.     By dividing an expansive, intensive logging program into many small bites, the BLM unlawfully evaded the full environmental review NEPA requires. The DR identifies multiple

adverse effects of salvage logging, but dismisses them as insignificant with no reasoned explanation. This violates the core purposes and requirements of NEPA.

100.    The Hotcase Project does not fit within a single CX.

101.    The Hotcase Project authorizes logging living, green trees under the guise of "salvage harvest."

102.    The Hotcase Project implicates multiple extraordinary circumstances, any one of which would require preparation of an EA or EIS.

103.    The BLM's failure to fully analyze the Hotcase Project in an EA or EIS violates NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, and contrary to law. 5 U.S.C. § 706(2).

### Count Two: Failure to Take a Hard Look at the Project's Impacts

104.    Guardians realleges and incorporates by reference all preceding paragraphs.

105.    Because the BLM unlawfully authorized the Hotcase Project without preparing an EA or EIS, it failed to adequately consider and disclose the Project's impacts as NEPA demands.

106.    As explained above, the Project will have potentially significant effects—both individually and cumulatively—on soil quality, threatened and endangered species, and invasive plant species. The Project may also significantly affect, *inter alia*, water quality, carbon storage and climate, and wildfire risk.

107.    None of these impacts were adequately analyzed in the Hotcase DR.

108.    None of these impacts were disclosed to the public.

109.    The BLM's failure to sufficiently analyze and disclose the direct, indirect, and cumulative impacts of the Hotcase Project violates NEPA and its implementing regulations and is

arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law. 5 U.S.C. § 706(2).

### SECOND CLAIM FOR RELIEF
### (Violations of FLPMA and APA)

110.    Guardians realleges and incorporates by reference all preceding paragraphs.

111.    Because the Hotcase Project authorizes activities prohibited by the RMP, the BLM's approval of the Project also violates FLPMA.

112.    The governing RMP specifically "[p]rohibit[s] timber salvage, except when necessary to protect public safety, or to keep roads and other infrastructure clear of debris," within riparian reserves.

113.    The Project authorizes logging on "20 acres within the [riparian reserve] for roadside hazard tree removal." DR at 1. The BLM failed to support its assertion that these 20 acres of logging actually targets "hazard trees," much less that it is "necessary to protect public safety." *See supra* ¶¶ 82–85.

114.    Even were the trees in question actually dead or dying, logging all trees "likely to die," rather than only trees likely to fall onto a road, is not hazard tree removal or "necessary to protect public safety"—it is simply salvage logging, which the RMP explicitly prohibits in riparian reserves.

115.    Moreover, the provision for public safety generally does not allow commercial salvage logging within riparian reserves: The RMP states that, when removing "hazard trees and blowdown from roads" in riparian reserves, the BLM shall "[r]etain such logs as down woody material within adjacent stands or move for placement in streams for fish habitat restoration, unless removal of logs, including through commercial harvest, is necessary to maintain access to roads and facilities."

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    23

116.    Similarly, when trees must be cut for "road construction, maintenance, and improvement," the BLM must retain most of those logs on site or in nearby streams.

117.    The DR does not explain why it is necessary to remove *all* cut trees for commercial sale.

118.    The DR also does not address how the proposed logging impacts the management goals for riparian reserves.

119.    The riparian reserves at issue are upstream of ESA-listed fish habitat and within an ODEQ-designated Source Water Protection watershed. The streams they encompass either are or flow into 303(d)-listed streams that do not meet applicable standards for water temperature.[5] Yet the DR does not discuss how logging will impact drinking water quality, fish habitat, ESA-listed species, or temperature.

120.    The DR does not address how logging will impact "forest shade, sediment filtering, wood recruitment, stream bank and channel stability, water storage and release, vegetation diversity, nutrient cycling, and cool and moist microclimates."

121.    In short, the DR entirely fails to address how the salvage logging will comply with any of the RMP standards and management objectives for riparian reserves.

122.    The Forest Service's authorization of salvage logging in riparian reserves violates FLPMA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and without observance of procedure required by law. 5 U.S.C. § 706(2).

---

[5] The Clean Water Act requires states to identify "impaired waters" that do not meet one or more water quality standards, including temperature. 33 U.S.C. § 1313(d). The list of such waters is commonly known as the "303(d) list."

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    24

**REQUEST FOR RELIEF**

WildEarth Guardians respectfully requests that this Court:

A.  Declare that the BLM's approval of the Hotcase Lane Salvage Project violated NEPA and FLMPA and is arbitrary, capricious, an abuse of discretion, and contrary to law;

B.  Vacate and set aside the 2024 Hotcase Lane Salvage Project ROD, and order the BLM to withdraw the ROD and any associated contracts until such time as the BLM demonstrates its full compliance with NEPA and FLPMA;

C.  Enjoin the BLM and its contractors, assigns, and other agents from implementing the Hotcase Lane Salvage Project until the violations of federal law set forth herein have been corrected;

D.  Enter such other declaratory relief and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Guardians;

E.  Award Guardians their reasonable costs litigation expenses and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.  Grant such further relief as this Court deems just and proper.

Dated this 5th day of May, 2025.

*/s/* Erin E. Hogan-Freemole
Erin E. Hogan-Freemole (OSB # 212850)
WildEarth Guardians
213 SW Ash Street, Suite 202
Portland, OR 97204
971-417-6851
ehoganfreemole@wildearthguardians.org

*Of Attorneys for Plaintiff*

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF                    25